RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 13-4358

TOBIAS HAROLD ELSASS; FRAUD RECOVERY GROUP,
INC.; SENSIBLE TAX SERVICES, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cv-00336—Peter C. Economus, District Judge.

Decided and Filed:  September 12, 2014

Before:  BOGGS, CLAY, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Brian J. Laliberte, BRIAN J. LALIBERTE CO. LPA, Columbus, Ohio, for
Appellants.  Bruce R. Ellisen, Kenneth W. Rosenberg, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee.

_____

### OPINION

_____

BOGGS, Circuit Judge.  The United States brought a civil action seeking to enjoin the
defendants—Tobias H. Elsass ("Elsass") and two entities that he founded and controlled, Fraud
Recovery Group, Inc. ("FRG") and Sensible Tax Services, Inc. ("STS")—from providing certain
services to taxpayers on the grounds that the defendants had frequently engaged in practices that
violate the tax laws.  *See* 26 U.S.C. §§ 7402, 7407, 7408.  The defendants' business focused on

1

identifying alleged investment scams and claiming theft-loss deductions, pursuant to 26 U.S.C. § 165, for taxpayers allegedly victimized by those scams. The government alleged numerous violations of the Internal Revenue Code ("IRC"), including 1) claiming theft-loss deductions for losses that did not involve criminal conduct, 2) claiming theft-loss deductions before it was clear that there was no reasonable prospect of recovery, 3) falsely characterizing theft losses as losses incurred in a trade or business to artificially inflate refunds, 4) claiming theft-loss deductions to which taxpayers were not entitled because the losses were incurred by their deceased relatives, 5) negotiating customers' tax-refund checks and depositing them into defendants' bank accounts, 6) falsely indicating that Elsass was an attorney in good standing, 7) making deceptive statements to customers that substantially interfered with the administration of the tax laws, 8) promoting an abusive tax shelter through false or fraudulent statements about the tax benefits of participation, and 9) aiding and abetting the understatement of tax liability ("Practices 1–9").

The district court held that there was no genuine issue as to whether Elsass and FRG had engaged in each of these prohibited practices. While it granted summary judgment to STS with respect to all claims save those arising out of Practice 9, because STS is wholly owned by Elsass, the district court enjoined STS to the same extent as Elsass and FRG. In light of their egregious and repeated violations of the tax code, the court enjoined Elsass, FRG, and STS from serving as tax-return preparers. Defendants appealed.

On appeal, defendants primarily argue that "[t]he district court erroneously determined that the definition of 'theft' for § 165(c) purposes hinged on state law," Appellants' Br. at 21, and that the court therefore "erred in determining that a theft did not occur in each of the scams described in the Complaint," *id.* at 35. Defendants also argue that the court erred in a) requiring a criminal conviction to establish a theft loss, b) determining that a reasonable prospect of recovery existed with respect to two of the three alleged scams, and c) imposing an injunction that was overbroad and vague in certain respects.

Defendants essentially challenge the district court's findings that the theft-loss deductions with respect to the three alleged investment scams were improperly claimed. That is, they challenge the district court's determinations with respect to Practices 1 and 2, and to that extent, Practices 7 and 9. But defendants do not appear to challenge the balance of the district court's

findings that underpinned its grant of the injunction (Practices 3–6 and 8). Because those findings would, in themselves, warrant granting the injunction, we affirm on those grounds and decline to reach the questions whether defendants could show a) that the alleged losses were due to theft and b) that no reasonable prospect of recovery existed at the time that the deductions were claimed. We note, however, that defendants' primary argument—that the district court applied an incorrect definition of "theft"—is, in any event, meritless.

**I**

The district court aptly summarized defendants' business model as follows:

> Collectively, the Defendants are in the business of helping taxpayers claim tax refunds through tax deductions for theft losses made allowable by § 165 of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 165. The Defendants' business focuses on purported theft losses arising from investment scams such as the one famously orchestrated by Bernie Madoff. Their business model consists of researching and identifying investment scams that might give rise to § 165 theft-loss deductions, marketing their services to the victims of such scams, and assisting the victims in filing amended tax returns to obtain a tax refund based on the loss sustained through the scam. In exchange for these services, the Defendants are compensated by a percentage of the refund obtained.

*United States v. Elsass*, 978 F. Supp. 2d 901, 906–07 (S.D. Ohio 2013). As the court later explained:

> Under the company's initial fee structure, customers had two options; either they could make an advance cash payment, calculated as a percentage of the estimated tax refund, or the fee could be deferred and taken by FRG as a percentage of the actual refund received. The current fee structure is similar, with prepay customers paying 15% of the expected return and deferred customers paying what Elsass terms a blended fee—7.5% cash in advance and 20% of the final refund. According to Elsass, a large portion of FRG's customers are elderly.

*Id.* at 908 (citations omitted).

The government introduced evidence showing that defendants were engaged in numerous practices that violated the IRC, and the district court held that there was no genuine issue as to the fact that defendants had regularly engaged in various forms of prohibited conduct.

***Practices 1 and 2***

The government brought to the district court's attention three alleged "scams" for which defendants claimed theft-loss deductions. The first involved an entity named American Business Financial Services ("ABFS"), which sold high-interest-rate notes to investors backed by subprime mortgages before becoming insolvent and filing for bankruptcy in January 2005. The second was a Ponzi scheme orchestrated by Joanne and Alan Schneider, in which the couple sold high-return promissory notes to investors and used the cash received from later investors to pay the interest owed to earlier investors. The third alleged scam involved OneCap Mortgage, a mortgage broker engaged in "first trust deed investing," in which investors' money is used to buy loans secured by real property, and investor returns come in the form of payments on those loans. OneCap filed for bankruptcy in 2010 following a downturn in the real-estate market in which borrowers defaulted on their loans.

The district court held that defendants understated taxpayer liability by improperly claiming deductions for losses that they could not show were due to criminal conduct (Practice 1) and by improperly claiming deductions before they could show that there was no reasonable prospect of recovery (Practice 2). 26 U.S.C. § 6694(b) provides that, where a tax-return preparer prepares returns that understate a taxpayer's liability, the preparer is subject to penalty if the understatement was made willfully or in "reckless or intentional disregard of rules or regulations." Section 7407 gives district courts the authority to enjoin conduct that is subject to penalty under § 6694. The district court held that there was no genuine issue as to whether the defendants, in engaging in Practices 1 and 2, "willfully and/or recklessly understat[ed] the tax liability of hundreds of FRG customers in violation of § 6694." *Elsass*, 978 F. Supp. 2d at 939.

The heart of defendants' appeal challenges the district court's determination that the theft-loss deductions were improper and that defendants were, at best, reckless in claiming them. As mentioned, because defendants do not dispute that they engaged in the other prohibited practices mentioned above and explained below in greater detail, we uphold the injunction and decline to consider their challenge to this particular finding.

***Practices 3 and 4***

The district court also concluded that defendants artificially inflated refunds by filing theft-loss deductions on the wrong forms (Practice 3). As the district court explained, "[t]heft loss deductions are . . . usually correctly claimed by taxpayers using Form 4684, titled 'Casualties and Thefts.'" *Id.* at 927. Defendants, however, typically filed theft-loss deductions on Form 4797. That form—titled "Sales of Business Property (Also Involuntary Conversions and Recapture Amounts Under Sections 179 and 280F(b)(2))"—is potentially appropriate if the losses were incurred in the course of a trade or business *carried on by the taxpayer*. As the court explained at length, using this alternative form enabled defendants to claim deductions of a kind and magnitude to which the taxpayers would otherwise not have been entitled. *Id.* at 927–30. That is because the trade-or-business deductions could be claimed "above the line," to reduce Adjusted Gross Income ("AGI"), rather than "below the line," and were therefore not subject to numerous restrictions applicable to below-the-line deductions. According to the testimony of an attorney who had previously worked for FRG, "when the customers' losses could not be extended forward or backward, Elsass instructed employees and contractors of FRG to use Form 4797 for the purpose of entitling the customer to additional deductions or state refunds through lowered AGI." *Id.* at 929. The district court concluded:

> Given that the proper characterization of itemized deductions is so easily ascertainable, especially to a person such as Elsass who possesses a law degree and holds himself out as an expert in theft-loss deductions, the improper use of Form 4797 by Elsass and FRG at the very least constitutes a reckless disregard for the I.R.C. and the tax rules and regulations in violation of § 6694(b).

*Id.* at 930. As mentioned, defendants do not appear to dispute this conclusion in their argument on appeal.

In addition, the court concluded that, on at least two occasions in the record that it was able to identify, defendants claimed theft-loss deductions on taxpayers' returns for losses incurred by their deceased relatives (Practice 4). Such deductions are improper because a relative of the deceased would have no personal basis in the investment. *See Reed v. Comm'r*, 51 T.C.M. (CCH) 1078 (1986) ("To qualify for a theft loss deduction, a taxpayer must establish his basis in inherited property before such loss can be determined."); 26 U.S.C. § 102 (income from

inheritance ordinarily not taxable). The evidence also showed that Elsass was aware that the deductions didn't belong to the taxpayers claiming them. In one instance, even after the taxpayer whom Elsass had sought out "explained to him that the investment was not her own, Elsass told her that FRG could get a tax refund from the IRS." *Elsass*, 978 F. Supp. 2d at 930. On appeal, defendants do not appear to dispute the court's conclusion "that there is no material issue of fact as to whether Elsass and FRG served as tax return preparers on behalf of relatives of deceased investors, and that, in doing so, Elsass and FRG violated § 6694(b) as a matter of law." *Id.* at 931.

In view of the foregoing, there appears to be no dispute that defendants systematically understated taxpayer liabilities a) by using the wrong forms and b) by at least occasionally claiming that taxpayers were entitled to deductions for the losses of their deceased relatives. Nor do defendants appear to dispute that such conduct was in reckless disregard of the tax rules, and to the extent that they do dispute it, any such claim has no support in the record, which is replete with violations. Accordingly, defendants are subject to injunction under § 7407 for Practices 3 and 4 even in the absence of Practices 1 and 2.

### *Practice 5*

The district court also determined that defendants improperly negotiated tax-refund checks that had been issued by the IRS to its customers (Practice 5). 26 U.S.C. § 6695(f) provides: "Any . . . tax return preparer who endorses or otherwise negotiates (directly or through an agent) any check made in respect of the taxes imposed by this title which is issued to a taxpayer" is subject to a penalty. Section 7407 also gives district courts the authority to enjoin conduct that is subject to penalty under § 6695. According to the district court, "the Government contends and the record establishes that Elsass and FRG employees negotiated some 510 refund checks between 2006 and 2011, with Elsass personally negotiating 203 checks." *Elsass*, 978 F. Supp. 2d at 931. "FRG would cash or deposit the refund checks, deduct any deferred fee to which it was entitled, and then pay the customer the remaining balance." *Ibid*. The district court held that there was no genuine issue as to whether Elsass's endorsement of checks was subject to penalty under § 6695 and enjoinable under § 7407, and defendants on appeal do not appear to dispute that holding.

***Practice 6***

Under 26 U.S.C. § 7407(b)(1)(B), a tax-return preparer may be subject to an injunction if he "misrepresented his eligibility to practice before the Internal Revenue Service, or otherwise misrepresented his experience or education as a tax return preparer." The district court held that Elsass misrepresented his eligibility to practice before the IRS by regularly indicating that he was a lawyer in good standing in Ohio when he had in fact been disbarred (Practice 6):

> Elsass admitted that his Ohio law license has been suspended indefinitely since 1998 and that he has never attempted to have it reinstated. However, the record is undisputed that on at least 273 separate occasions between 2005 and 2010 he signed Form 2848 indicating that he was a licensed attorney, despite receiving warnings concerning his status as an attorney from the Treasury Department. Aside from issues of perjury, such conduct undoubtedly constitutes a misrepresentation of Elsass' eligibility to practice before the IRS.

*Elsass*, 978 F. Supp. 2d at 932–33 (citations omitted).

We question whether misrepresenting that one is authorized to practice law qualifies as misrepresenting one's "eligibility to practice before the IRS." According to IRS Publication 947, *available at*: http://www.irs.gov/pub/irs-pdf/p947.pdf, individuals generally lose eligibility to practice before the IRS in one of three ways: 1) "[n]ot meeting the requirements for renewal of enrollment (such as continuing professional education), 2) "[r]equesting to be placed in inactive retirement status," and 3) "[b]eing suspended or disbarred by the Office of Professional Responsibility for violating the regulations governing practice before the IRS." It is not clear how Elsass's lies about his status as an attorney would fit into any of these three categories. And as for the third category, he was disbarred by the State of Ohio, not the IRS's Office of Professional Responsibility. Nonetheless, defendants nowhere challenge the district court's determination that Elsass may be enjoined under 26 U.S.C. § 7407(b)(1)(B) for his misrepresentations, and we decline to disturb that conclusion *sua sponte* on appeal absent a firm conviction that it is incorrect and is a "pure question of law that cries out for resolution." *See Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 984 (6th Cir. 2000) ("Failure to raise an issue on appeal would normally constitute a waiver of that issue.").

*Practice 7*

Pursuant to 26 U.S.C. § 7407(b)(1)(D), the district court may enjoin tax-return preparers "engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws." The district court held that defendants engaged in such conduct by misleading customers in various ways (Practice 7). *Elsass*, 978 F. Supp. 2d at 933. For example, with respect to one of the alleged scams, the Schneider scam, defendants made a statement about the date of discovery in a promotional letter to potential customers that "fail[ed] to mention the legal requirements concerning the prospects for recovery and ignore[d] the fact the IRS had already begun to disallow Schneider theft losses using 2004 as the year of discovery." *Ibid.* The court held that the letter substantially interfered with the proper administration of the revenue laws because it encouraged taxpayers to claim improper deductions. *Ibid.* To the extent that defendants dispute the court's finding that the claimed theft-loss deductions were improper, they likewise may be presumed to challenge the injunction insofar as it was imposed pursuant to § 7407(b)(1)(D). Beyond that, however, the injunction would remain justified in view of certain other misleading statements and actions. For example, Elsass's statement to one customer that she could obtain a refund for an investment that was not her own likewise encouraged her to claim an improper deduction.

*Practice 8*

Under § 7408, the district court may enjoin conduct that is subject to penalty under, inter alia, §§ 6700 and 6701. Section 6700 penalizes, among other things, the making of false or fraudulent statements "with respect to the allowability of any deduction." The district court held that the defendants made such statements (Practice 8) by falsely claiming to customers, inter alia, that theft-loss deductions must be supported by expert testimony, that the date of discovery for the Schneider scam was 2004, that such deductions can be claimed despite the prospect of recovery, that such deductions can be claimed on behalf of deceased relatives, that CPAs cannot prepare returns claiming theft-loss deductions, and that claims for such deductions require an "Attorney Letter," a "Theft Loss Opinion," and a review "of over 95 years of legal opinions and IRS rulings that proves the six elements are present to perform a 165(c)(2)." *Elsass*, 978 F. Supp. 2d at 935. The court found no genuine issue as to whether the defendants knew that those

statements were false. Defendants do not appear to dispute that the vast majority of the aforementioned statements were false and that defendants' conduct was therefore enjoinable under § 7408.

### *Practice 9*

Section 6701 penalizes "aiding and abetting [the] understatement of tax liability." The court held that defendants "violated § 6701 by assisting customers in filing amended tax returns containing improper theft-loss deductions" (Practice 9). *Id.* at 937. Given that defendants appeal the district court's finding that the theft-loss deductions were improper, they would presumably argue that they did not aid and abet the understatement of tax liability by claiming those deductions.

## II

### A

This court reviews a district court's grant of a permanent injunction for abuse of discretion. *United States v. Gleason*, 432 F.3d 678, 681 (6th Cir. 2005). We review a district court's decision granting summary judgment de novo. *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

### B

Because the district court's undisputed findings in themselves warrant the issuance of the injunction, we affirm on that basis. To recap, defendants do not dispute that they falsely characterized theft losses as losses incurred in a trade or business to artificially inflate refunds; claimed theft-loss deductions to which taxpayers were not entitled because the losses were incurred by their deceased relatives; negotiated customers' tax-refund checks and deposited them into defendants' bank accounts; and falsely indicated that Elsass was an attorney in good standing. Even putting aside statements as to the proper timing of the theft-loss deductions and whether the alleged scams were properly considered thefts, defendants do not dispute having

made numerous other false or fraudulent statements—some of which have been referenced above—that either substantially interfered with the administration of the tax laws (enjoinable under § 7407(b)(1)(D)), were made with respect to the allowability of any deduction (enjoinable under § 7408), or both. Nor can they dispute that at least some of the prohibited conduct in which they engaged aided and abetted the understatement of tax liability (also enjoinable under § 7408).

In view of these undisputed violations of the IRC, the district court properly granted summary judgment to the government. And in view of the egregiousness of defendants' conduct, the district court in no way abused its discretion in enjoining them from preparing tax returns in the future.

## C

Although not necessary to our holding, given the amount of attention defendants devote to the question of what definition of "theft" is proper, we briefly address their argument with respect thereto. Defendants argue that the district court erroneously applied a state-law definition of "theft" in determining whether the disputed theft-loss deductions were legitimate. They cite a recent Court of Federal Claims decision, *Goeller v. United States*, 109 Fed. Cl. 534, 547 (2013), for the proposition that the court should have relied on the federal-common-law definition of theft rather than the state-law definition. Defendants argue that "[d]etermining whether a theft occurred under the *Goeller* definition would have changed the outcome of the district court's analysis." Appellants' Br. at 34.

Defendants' argument is meritless. First, as the government points out, under the established law of this circuit, as in other circuits, "[w]hether a 'theft' has occurred for purposes of § 165 is determined by the law of the jurisdiction where the theft took place." *Alioto*, 699 F.3d at 955. Second, as the government also points out, the district court did not rely strictly on the state-law definition of theft to determine whether the alleged investment scams qualified as "thefts." Rather, the court also recognized the Fifth Circuit's oft-cited definition of the term, explaining that theft, as mentioned, is "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." *Edwards*

*v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956). Third, at no point do defendants appear to have brought to the district court's attention any distinction between state-law and federal-common-law definitions of theft. Accordingly, any argument that the court should have applied the *Goeller* definition was forfeited. Fourth, and most important, there is no indication that the outcome would have been any different had the district court applied the *Goeller* definition of theft. Under *Goeller*, the Court of Federal Claims, citing Black's Law Dictionary, defined theft for purposes of § 165(c) as "the fraudulent taking of property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with the intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking." *Goeller*, 109 Fed. Cl. at 549. The district court found that the losses in two of the three so-called "scams"—ABFS and OneCap—did not involve criminal intent—i.e., there was no evidence that the so-called scams involved the taking of property without consent with the intent to deprive the owner of the value thereof. Nowhere do defendants explain how their deductions would have been valid under the *Goeller* definition of theft but invalid under state-law definitions of theft.

### III

Finally, defendants argue that the injunction is "overly broad" because it "is not specific enough concerning to whom it applies." Appellants' Br. at 55. By its terms, the injunction enjoins "Defendants, including their representatives, agents, servants, employees, attorneys, contractors, and any related, affiliated, or successor entities." As the government helpfully points out, that language tracks closely the language of Federal Rule of Civil Procedure 65(d)(2), which states that an injunction binds a) "the parties," b) "the parties' officers, agents, servants, employees, and attorneys," and c) "other persons who are in active concert or participation with anyone described" in categories (a) and (b), provided that the individuals in question have actual notice of the injunction. As the Supreme Court has explained, rather than indicating that the injunction is overbroad, the inclusion of those individuals or entities "is derived from the commonlaw doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). "In essence it is that

defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Ibid.*

Appellants apparently allege that the government is interpreting the injunction too broadly in seeking to apply it to two individuals who had a prior relationship with Elsass.  First, it is doubtful that defendants have standing to bring a claim that the injunction "is so overly broad and non-specific that it violates the due process rights of certain non-parties," Appellants' Br. at 56, as that is not their claim to bring.  Second, as the government duly points out, the government's interpretation of the injunction "does not go to the validity of the injunction." Appellee's Br. at 59.  Third, the district court also explained that the parties could "approach the Court for clarification as needed."  In light of the facts that the language of the injunction essentially tracks the language of the Federal Rules and that the court offered to provide clarification as needed, defendants' objection that the injunction is vague and overbroad would not be well taken even if defendants had standing to assert it.

Defendants also claim that the injunction is vague because "the district court did not provide the parties with specific direction concerning the manner in which Elsass 'may meet [his] obligations under any active contracts entered into with customers as of the date of this Judgment.'"  Appellants' Br. at 57 (quoting the district court's injunction).  There is a degree of generality that is inevitable in any order, such as the district court's injunction here.  But there is nothing inherently vague or confusing about the court's allowing defendants to meet their remaining obligations under active contracts.  Defendants seek a remand for clarification from the district court, but, as mentioned, the district court has already stated that the parties could seek clarification as needed, and there is no indication that the court will be unable to provide adequate guidance to ensure that its order is sufficiently clear.  If defendants willfully choose to construe the injunction in a way that its language will not support, they do so at their peril.

**IV**

We therefore AFFIRM the judgment of the district court.